INDUSTRIAL INDEMNITY COMPANY, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. PETER VUKMARKOVIC *et al.*, Defendants and Counterplaintiffs-Appellees and Cross-Appellants.

First District (4th Division) No. 1—89—2706

Opinion filed October 18, 1990.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Thomas M. Crisham, Stephen R. Swofford, and Janet R. Davis, of counsel), for appellant.

Corboy & Demetrio and Baker & McKenzie, both of Chicago (Thomas A. Demetrio, Philip H. Corboy, Jr., Francis D. Morrissey, and Edward J. Zulkey, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Industrial Indemnity Company, filed this declaratory judgment action to determine the existence of coverage under a comprehensive business insurance policy that Industrial had issued to the owner of a limousine that collided with a pedestrian. The pertinent provisions of the policy are found within the "personal umbrella liability extension," which in essence provides coverage for the personal activities of the individual insureds. This personal umbrella extension does not cover "any 'business' activities of any individual Named Insured" and specifically excludes from coverage "any business or business pursuits of an Insured or to property on which a business is conducted by an Insured."

Defendants are Peter Vukmarkovic, the driver of the limousine at the time of the occurrence, and the injured party, Taide Corral, by his co-guardians, Alberto Ruiz Corral and the Northern Trust Company (collectively referred to as Corral). In the underlying personal injury suit, Corral had sued Vukmarkovic, obtaining a jury verdict in an amount in excess of $16 million. Corral collected a portion of his judgment from another insurance company, which had provided Vukmarkovic with a defense in the personal injury lawsuit. Thereafter, Corral instituted a garnishment action against Industrial for payment under its personal umbrella extension. Industrial, which had declined to tender a defense to Vukmarkovic for the personal injury lawsuit, filed the pending action for a declaration of noncoverage under its policy. Vukmarkovic and Corral counterclaimed, seeking a declaration that the Industrial policy covered Vukmarkovic and his activities, on the grounds that Vukmarkovic used the limousine with the permission of Latimer, an individual named insured, and therefore was himself an

additional insured under Industrial's policy.

The parties filed cross-motions for summary judgment. The trial court held that the policy did provide coverage for the occurrence and therefore entered judgment in favor of Corral and Vukmarkovic on the issue of coverage. The trial court further entered a money judgment of $5 million, the policy limits, plus prejudgment interest.

On appeal, Industrial challenges the trial court's construction of the policy as well as its calculation of the time period for which prejudgment interest should be awarded. Corral and Vukmarkovic cross-appeal from the calculation of interest, contending that the trial court improperly denied their request for the higher, post-judgment rate of interest, which they classify as representing their proper "consequential damages."

We affirm.

BACKGROUND

Industrial issued an automobile dealers' insurance policy to certain named insureds, including Woodfield Ford Sales, Inc., Charles Latimer, and Ray Martin. Latimer and Martin together owned Woodfield Ford. The policy also provided coverage under a personal umbrella liability extension, which provides:

> "Coverage. If properly noted in the General Declarations, and in consideration of the premium paid, it is agreed that, except as respects such coverage as is afforded by this Section, this policy does not cover any 'business' activities of any individual Named Insured. It is further agreed that the word 'business' includes trade, profession, or occupation."

Paragraph 3(c) of the umbrella extension, section B, defines "Individual Named Insured" as meaning:

> "the individual named in the General Declarations and also includes the spouse thereof if a resident of the same household. The unqualified word 'insured' includes the individual Named Insured and also:
>
> * * *
>
> (2) any person while using an automobile or watercraft owned by *** the individual Named Insured *** with the individual Named Insured's permission."

Paragraph 4 of section B provides:

> "4. Exclusions. This Coverage Part V, Section B shall not apply:
>
> * * *
>
> g. to any business or business pursuits of an Insured or to property on which a business is conducted by an Insured ***."

Charles Latimer, one of the individual named insureds on the Industrial policy, purchased a Mercedes limousine in 1984 as a business investment. He entered into an agreement with Lisle Livery, Inc., under which he relinquished complete control and maintenance of the vehicle to Lisle. In exchange, Latimer was to receive 30% of the proceeds from Lisle's use of the limousine in its livery service. Lisle's sole shareholder added the limousine to its "Business Auto Policy" that was issued by National Union Fire Insurance.

Peter Vukmarkovic was assigned Latimer's limousine to drive. He was responsible for the automobile's maintenance and care and he parked it at his home, because Lisle had no garage facilities. He was permitted to use the car for his own errands when he was not working as a driver for Lisle.

On Saturday, April 27, 1985, Vukmarkovic took passengers to O'Hare airport for his first job. After another trip to the airport he went home for awhile. Later he took some people to a wedding in the afternoon. In the evening, he picked up some passengers from the airport and took them to Naperville, dropping them off between 11:30 and 11:45 p.m. He went to dinner at 1 a.m. with some friends at a restaurant/night club. When the establishment closed at about 4:30 a.m., he left in the limousine to return to his house. While driving along Ashland Avenue in Chicago, he struck and severely injured Taide Corral, who was standing in a safety zone on the street.

In the ensuing personal injury lawsuit, Corral named as defendants Vukmarkovic, Lisle, and Latimer. Before trial, however, he dismissed the complaint as against Lisle and Latimer, leaving Vukmarkovic as sole defendant. National Union Fire Insurance, Lisle's insurer, defended the lawsuit. That company later paid the limits of its policy toward the judgment that was entered upon the jury's verdict. Corral then attempted to collect on his judgment against Vukmarkovic, instituting a garnishment action to recover proceeds from the Industrial policy. His theory for recovery was based on Vukmarkovic's status as an insured under the personal umbrella liability extension coverage.

Industrial then filed the instant declaratory judgment action seeking a judicial determination that no coverage applied. Corral and Vukmarkovic counterclaimed, seeking the opposite determination. As part of their counterclaim, Corral and Vukmarkovic sought damages in excess of the policy limits of $5 million, based on Industrial's alleged bad faith in failing to acknowledge coverage and pay the claim. That portion of the lawsuit is not before this court on this appeal, which is brought pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)).

After a hearing on the parties' cross-motions for summary judg-

ment on the coverage issues, the court determined that the personal umbrella extension did provide coverage and, to the extent the language was ambiguous, such ambiguity would be construed against Industrial. Accordingly, the trial court entered summary judgment in favor of the insured, Vukmarkovic, and the injured party, Corral, holding that Industrial must pay the $5 million limits of its policy toward the personal injury award. In addition, the court resolved an issue concerning prejudgment interest, awarding 5% interest beginning on the date the insurance claim was considered "due and payable" under the terms of the policy. The court found the date of judgment in the underlying personal injury lawsuit, November 23, 1988, as the date the "loss payable" under the policy could be declared with certainty, and in conformance with the requisites of other policy language, found that "prejudgment interest" in the amount of 5% would accrue beginning 30 days thereafter, or December 23, 1988. The judgment in the pending declaratory action was entered on September 27, 1989, and, accordingly, the trial court calculated the amount of accrued interest due from December 23, 1988, through September 27, 1989.

OPINION

I

Industrial's challenge to the trial court's construction of its policy is twofold. First, Industrial argues that because Latimer, the named insured, was engaged in a business activity with respect to his leasing the limousine to Lisle for use in its livery service, the general coverage provisions of the personal umbrella liability extension never were triggered. Second, even assuming that Latimer's leasing of the automobile was not considered a business activity, Vukmarkovic's conduct on the night of the accident was part of Vukmarkovic's "business pursuits" and, therefore, the express exclusion under section 4g of the policy applied to preclude any recovery of insurance proceeds.

A

Industrial relies heavily on *Insurance Co. v. Markogiannakis* (1989), 188 Ill. App. 3d 643, 544 N.E.2d 1082, a case in which the court construed a "business pursuits" exclusion as applicable in the context of a business-related altercation that occurred between the insured and another, who was injured as a result. The court looked to the nature of the activity that the insured was engaged in at the time of the other party's injuries before concluding that the incident arose in a business-related context, rather than incidental to a personal mat-

ter. Part of the court's analysis centered on the definition of a business pursuit, which it called

"a continuous or regular activity, done for the purpose of earning a profit. (*State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 252, 430 N.E.2d 641, 643 \*\*\*.) This includes even part-time or supplemental income activities. (*Moore*, 103 Ill. App. 3d at 252 (paid baby-sitting in one's home on a regular, continuous basis) \*\*\*.) Under this definition, recognized in the majority of jurisdictions, including Illinois, [the insured] engaged in a business pursuit by renting an investment property over a continuous three-year period for the purpose of obtaining profit." *Markogiannakis*, 188 Ill. App. 3d at 655-56, 544 N.E.2d at 1090.

The definitional discussion in that case does suggest that an investment such as rental of property may be viewed as a "business pursuit." *Markogiannakis* noted, however, that no other Illinois decision had construed the identical insurance policy language at issue, which defined business pursuit as "includ[ing] trade, profession, or occupation." (188 Ill. App. 3d at 656, 544 N.E.2d at 1090.) Under the circumstances of that case, moreover, it is evident that the court's ruling was based on the fact that the named insured was conducting *business* on the premises at the time of the occurrence. In contrast to that situation, in the pending case the trial court decided that Vukmarkovic, permissive driver of the named insured's vehicle, was driving the limousine for purely personal reasons at the time of the accident. We therefore find that the situation addressed in *Markogiannakis* is distinguishable from that in the pending case.

Industrial nevertheless would have us classify Latimer's purchase and transfer of the limousine to Lisle as a business activity or pursuit that would fall *per se* outside of the insured risks under the policy, thereby cutting off coverage for Vukmarkovic's permissive use of the automobile as well. In other words, under this view, Vukmarkovic's coverage is derivative of Latimer's and if Latimer is not covered, Vukmarkovic is not either.

■ Although we do not imply that Industrial's position is without some logical merit, we must reject its interpretation of the policy under the principles of construction that prevail under the law of insurance contract. Vukmarkovic's status as an insured under the policy arises from his status as a permissive driver of the named insured's automobile. Paragraph 3(c)(2) of the personal umbrella extension provides that "any person while using an automobile owned by [the named insured with his permission]" is an insured. A "severability

clause" in the policy further provides that each insured is considered to have his or her own separate coverage under the policy. (See *United States Fidelity & Guaranty Co. v. Globe Indemnity Co.* (1975), 60 Ill. 2d 295, 297, 327 N.E.2d 321, 323.) Industrial does not dispute that Vukmarkovic was a permissive driver of Latimer's automobile, nor does it challenge the fact that all "additional" insureds are considered to have their own, separate coverage under the policy. Instead, as noted, Industrial challenges the existence of coverage in the first instance, on the grounds that *Latimer*'s arrangement with Lisle Livery fell within the definition of "trade, profession, or occupation" under the general coverage language.[1]

■ Whether Latimer, a named insured, would be excluded from coverage in all instances because of his business investment does not conclusively decide the issue of whether *Vukmarkovic* is considered an insured by his permissive use of the limousine while on a *personal* pursuit. The trial court did not view Vukmarkovic's *use* of the automobile at the time of the occurrence as a business pursuit on the part of anyone. We agree with the trial court that the dispositive question in this case is not whether Latimer had a business motive in purchasing the limousine for use in Lisle Livery's business. In deciding whether a particular automobile accident is covered under a specific policy, courts generally focus on the use of the vehicle *at the time of the occurrence. E.g., State Farm Mutual Auto Insurance Co. v. Mohan* (1967), 85 Ill. App. 2d 10, 228 N.E.2d 283 (body shop partner who was to pick up dealership's car for servicing but who first took girl friend on a tour of nightclubs in the insured car was held to be covered under two policies that contained business use exclusions); *Kravis v. Smith-Marine, Inc.* (1974), 20 Ill. App. 3d 483, 314 N.E.2d 577 (boat owner's policy provided coverage for injuries of third parties in collision when the boat was being transported to marina for repairs; the boat was not being used for a business purpose at the time of the accident and the driver of the boat was an additional insured

---

[1]Undoubtedly, as an investment, Latimer hoped to realize some economic benefit from the arrangement. Nevertheless, it is not as clear to us that Latimer's arrangement with Lisle was part of his "trade, profession, or occupation." His purchase of the vehicle is analogous to an investment of capital as a passive investment. His receipt of a percentage of the proceeds that Lisle realized upon the use of the limousine is his return on the investment. While we do not necessarily imply that a distinction should be made between "passive investments" and "business activities," at least where it is the activity of the insured that is in issue, we nevertheless believe that the burden is on the insurance company to clearly delineate what types of risks are excluded from coverage.

because he had the owner's permission to drive the boat).

■■ Vukmarkovic's activities at the time of the accident, therefore, must be classified as being either (1) in furtherance of his personal pursuits, or (2) in furtherance of his business pursuits (and, by extension, those of Lisle and Latimer). As Industrial concedes, Vukmarkovic fits the policy definition of an insured. Therefore, we believe that the severability clause entitles him to coverage for his permissive use of the vehicle owned by the named insured, as long as his use of the limousine at the time of the occurrence was a personal one. We conclude that Vukmarkovic did not lose his status as an insured merely because the vehicle he was driving on a personal mission was made available to him through Latimer's decision to "invest" in the limousine service.

■■ Section VB 1, the general "coverage" provision of the personal umbrella liability extension, provides additional support for this conclusion, to the extent it contains an ambiguity as to what precise circumstances are covered within the personal liability extension. This provision states:

> "[E]xcept as respects such coverage as is afforded by this Section, this policy does not cover any 'business' activity of any individual Named Insured. It is further agreed that the word 'business' includes trade, profession, or occupation." (Emphasis added.)

The italicized language suggests that while the named insured's business activities are not covered by the personal umbrella extension, there are some circumstances in which coverage is available, depending upon the facts. Since Vukmarkovic's *personal* use of the "investment" vehicle appears to fit within this language, we cannot say that the policy as written clearly cuts off coverage. To the extent this language is ambiguous, it must be construed against the drafter, Industrial. *E.g., State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 255, 430 N.E.2d 641; see also *Insurance Co. v. Markogiannakis* (1989), 188 Ill. App. 3d 643, 662, 544 N.E.2d 1082 (if insurer declines to defend under a policy exclusion, application of such exclusion must be clear and free from doubt because questions of coverage will be resolved in the insured's favor).

We conclude that since Vukmarkovic was a permissive driver of the limousine, separately covered under this personal umbrella, his personal use of the vehicle at the time of the accident was a risk that falls within the coverage of the policy. If, in contrast, Vukmarkovic's use of the car had been in furtherance of any business pursuit, the specific exclusion of section 4g would have operated to preclude cov-

erage. See *State Farm Mutual Auto Insurance Co. v. Mohan* (1967), 85 Ill. App. 2d 10, 228 N.E.2d 283.

*Rusk Aviation, Inc. v. Northcott* (1986), 151 Ill. App. 3d 126, 502 N.E.2d 1309, does not aid Industrial's argument. There, a student pilot crashed during a solo flight, causing damage to other aircraft on the ground. The aircraft's owner had an aviation liability insurance policy that insured "any person while using or riding in the aircraft *** provided the actual use is with the permission of the Named Insured." (151 Ill. App. 3d at 127, 502 N.E.2d at 1310.) In holding that the insurance policy did not provide coverage to the student pilot despite his permissive use of the aircraft, the court relied on a distinct, specific provision in the policy that excluded any person operating the aircraft "under the terms of any rental agreement or training program which provides any remuneration to the Named Insured for the use of said aircraft." (151 Ill. App. 3d at 127-28, 502 N.E.2d at 1311.) Since the student pilot in question was in fact involved in a training program that provided payment to the named insured, his activity was one of the risks specifically excluded under the policy. The court concluded that the status of the pilot pursuant to the rental or training exclusion determined whether the pilot was an insured under the policy, not the "omnibus" provision granting coverage to permissive users in general.

■ We do not believe that our analysis conflicts with that of the court in *Rusk*. Like the policy in that case, Industrial's policy contains a specific exclusion that would cut off from coverage the "omnibus" or permissive user of the vehicle (Vukmarkovic), if that user was engaged in a noninsured activity. In *Rusk*, the pilot, who may have been eligible for coverage under other circumstances, was engaged in the noninsured activity of flying pursuant to a training program that involved remuneration to the owner of the aircraft. In the pending case, Vukmarkovic was engaged in an activity that the trial court deemed to be personal, rather than in furtherance of a business pursuit. Hence, the express exclusion of section 4g did not operate to exclude coverage.

We conclude that Industrial's first challenge to coverage, based on the characterization of *Latimer*'s purchase and transfer of the limousine, must fail. He was not the person whose conduct caused the occurrence. Rather, Vukmarkovic, as the person driving the automobile, is the insured whose coverage is in issue.

B

In that regard, Industrial next contends that the business pursuits

exclusion of section 4g of the policy bars Vukmarkovic's claim for coverage under the facts of the case. In support, Industrial cites several cases in which the courts denied coverage under similar exclusions, finding that business concerns, rather than personal ones, were the primary motivators of the conduct leading to the particular injuries. *Markogiannakis*, 188 Ill. App. 3d 643, 544 N.E.2d 1082; *Bruns v. Foremost Insurance Co.* (1975), 27 Ill. App. 3d 50, 325 N.E.2d 815; *Auto-Owners Insurance Co. v. Corrie* (1981), 102 Ill. App. 3d 93, 429 N.E.2d 883; *State Farm Fire & Casualty Co. v. Stinnett* (1979), 71 Ill. App. 3d 217, 389 N.E.2d 668.

In *Markogiannakis*, the owner/lessor of a condominium unit who had come to the building to collect rent from his tenant was held not to be covered under his homeowner's policy because of a business pursuits exclusion. The insured had gotten into an altercation with an officer of the condominium association over his failure to pay his share of the assessments, and during the course of the argument, he either pushed her or negligently caused her to be injured. The court determined that the incident happened while the insured was engaged in the business pursuit of collecting his rents. *Bruns*, like *Markogiannakis*, involved the application of a business pursuits exclusion to an altercation between the insured and another person, his business partner. Because the court determined that the dispute between the partners involved business, the policy was held not to provide coverage.

Similarly, in *Corrie*, the business pursuits exclusion under the insureds' homeowner's policy was held to apply under the particular circumstances. The insureds managed a laundromat that was located in the same building as their apartment. The owner of the laundromat paid the insureds to remove snow and ice from the sidewalk in front of the building. A patron of the laundromat slipped on the snow-covered sidewalk and sued for her injuries. The court held that the primary reasoning for the insured's snow-removal activity was related to the laundromat business and therefore the business pursuits exception applied, even though there may have been an "incidental," personal reason for the snow removal, to allow the insureds access to their own apartment.

*Stinnett* involved the application of a homeowner's policy to an insured's activities in cutting weeds on farm property that he rented on a profit-sharing basis. While the tractor was stopped near the road, a person driving by in a car struck the mower attachment and sustained injuries. The court held that the business exclusion applied because the main purpose for the insured's cutting of the weeds was to pre-

vent their spread into the planted fields. The incidental, cosmetic purpose served by mowing did not affect the operation of the exclusion.

■■ The similar strand of reasoning running through these cases is the notion that the court must look to the purpose the insured was pursuing, or the nature of his activities, at the time of the incident that gives rise to a claim for insurance. Like a personal umbrella liability extension, a homeowner's policy generally is intended to insure against non-business-related risks. Accordingly, we find the above cases factually distinguishable from court's finding that Vukmarkovic's conduct at the time of the accident was *not* primarily related to a business pursuit.

The record establishes, without dispute, that Vukmarkovic was allowed to use the car for personal reasons as well as business ones. That he was "on call" 24 hours a day for the livery service does not mean that whenever he was driving the limousine he was necessarily engaged in a business pursuit. We cannot agree with Industrial that Vukmarkovic had merely stopped for dinner as a minor interruption of his business pursuit of returning the car to his garage following his last fare. Such a conclusion would be possible if the accident had occurred while Vukmarkovic was driving from one job to another, from a lunch break to another job, or on his return home directly after dropping off his last fare. In contrast to that scenario, the particular facts in the record reveal that Vukmarkovic was "off duty" and had finished his livery jobs for the day when he went to the restaurant/lounge to meet his friends at 1 a.m. He had dropped off his last fare before midnight. Presumably, he could have gone back home and garaged the limousine, taking his own car. Instead, he drove the limousine to meet friends, eat dinner, dance, and otherwise socialize with them until 4:30 a.m. It was during his subsequent drive home, on the wrong side of Addison Street at 5 a.m., that he struck and injured Corral.

■■ We do not agree that such facts fit into the "business pursuits" exclusion. Accordingly, we find that the trial court's decision that section 4g did not bar coverage was proper. Because of our conclusion we need not consider the cases Industrial cites regarding the "dual purpose trip" in workers' compensation cases or the tort doctrine of *respondeat superior*. Neither of those doctrines is premised on contract principles or policies. The interpretation and application of insurance contract language is not aided by considering tort and workers' compensation law.

## II

■■ Industrial's remaining issue on appeal requires us to deter-

mine whether the trial court properly awarded prejudgment interest in the amount of 5% on the $5 million judgment and whether the court's calculation of when the interest began to accrue is appropriate. That prejudgment interest may be recovered under an insurance policy from the time money becomes due thereunder is not disputed. *Ervin v. Sears, Roebuck & Co.* (1984), 127 Ill. App. 3d 982, 469 N.E.2d 243.

Industrial's position is that any award made pursuant to the prejudgment interest statute (Ill. Rev. Stat. 1987, ch. 17, par. 6402) could not have begun to accrue until Industrial's liability under its policy was "fixed or readily ascertainable." According to Industrial, its policy limits could be diminished by any of a number of expenses incurred on behalf of an insured because it is an "ultimate net loss" policy. "Ultimate net loss" is defined in the policy to include the total sum which an insured becomes obligated to pay to another because of personal injury or property damages, and includes legal expenses, interest, and other such costs of litigating or settling claims and suits. The policy limits of $5 million thus are in the aggregate, subject to diminution by any other claims paid under the policy. Industrial therefore argues it was "impossible" for it to fix an amount under the policy until September 7, 1989, the date on which "the trial court entered an order prohibiting Industrial from paying any amounts which might otherwise become due under the policy." Since the final judgment in the pending case was entered on September 27, 1989, this would allow for only 20 days of prejudgment interest.

■ Industrial's argument makes little sense. The prejudgment interest statute does require that the amount claimed be readily determined or ascertainable. It does not follow, however, that because there *may* have been other, potential claims under the policy, such theoretical claims rendered the policy limits unascertainable. If such claims had been made or paid, Industrial certainly would have had that information available to it and would have taken the claims into account. In the pending case there is no suggestion that any such claims existed or that the $5 million policy limits had been diminished thereby. Accordingly, we reject Industrial's contention that the ultimate net loss provision of the policy rendered the claim "unfixed" or uncertain until the September 7, 1987, court order that enjoined the company from paying any claims in diminution of the policy limits.

Alternatively, Industrial argues that the operative date for the assessment of prejudgment interest must be the later of three occurrences that are set out in the "loss payable" provision of its policy. This section provides:

"Liability under this policy with respect to any occurrence

shall not attach unless and until the Assured, or the Assured's underlying insurer shall have paid the amount of the underlying limits on account of such occurrence. The Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the insured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured *or* after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial *or* by written agreement of the Assured, the claimant, and Underwriters. If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy." (Emphasis added.)

Industrial interprets this section of its policy to mean that it is entitled to choose the latest of three different events: (1) the date that the underlying personal judgment became final; (2) the date that a definite claim was made; or (3) the date that the underlying insurer, National Union Fire Insurance, paid the limits of its $1 million auto insurance policy on behalf of its insured, the owner of Lisle Livery Services. The latest of these events presumably is the date National Union tendered its policy limits toward Corral's personal injury award, January 18, 1989. In reliance on the last sentence of the provision, Industrial concludes that prejudgment interest should not have begun accruing until February 17, 1989.

Industrial does not further explain its interpretation of the loss payable language. Nor does it cite case law to support this construction. We initially note that nothing in the provision refers to an election of various contingencies or to a preference for the latest occurring event, and since the provision itself has disjunctive phrasing, we reject Industrial's implausible construction of that language.

■■■ The trial court decided that the operative loss payable date, for purposes of determining the application of the prejudgment interest statute, was the date that the underlying personal injury lawsuit was reduced to judgment, plus 30 days. We believe that unless the trial court's reliance on the date of the underlying personal injury judgment was an abuse of its discretion or against the manifest weight of the evidence of record, it should be affirmed. (See *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 849, 512 N.E.2d 1286, 1295.) We note that neither side to this controversy offers a completely satisfactory argument as to when the

prejudgment interest should accrue. Industrial had been on notice of the claim since its consideration and rejection of Vukmarkovic's request for a defense to the personal injury lawsuit. Industrial did not seek declaratory relief at that time. When the jury returned a verdict to Corral in the amount of $16 million and judgment was entered thereon in November 1988, the fact that another insurer was liable for a portion of that amount did not affect Industrial's separate obligation for the excess, assuming that Industrial's coverage liability was adjudicated in favor of Vukmarkovic and Corral. In view of these facts, and in the absence of any compelling reasons to disturb the trial court's calculation of when the interest should begin to accrue, we affirm the court's finding that interest at the rate of 5% should be awarded from December 23, 1988 (one month after the entry of judgment on the jury's verdict), through September 27, 1989. In so holding we acknowledge that it is not clear to us that the last sentence of the loss payable provision required the court to add 30 days to the date of the personal injury judgment before beginning the accrual of interest. The last sentence of that provision appears to modify the preceding sentence, which says that if the insured makes "subsequent payments" to injured parties, "additional claims" for those losses shall be made from time to time. In that context, "such losses" are to be deemed due and payable within 30 days after they are claimed with respect to the policy. Notwithstanding our different reading of the 30-day provision, however, we affirm the trial court's calculation.

## III

■■ Vukmarkovic and Corral cross-appeal from the trial court's rejection of their claim for consequential damages in the amount of 9%, to accrue from the date that the personal injury judgment was entered, November 23, 1988. While they justify this higher interest rate as necessary to make them "whole," their attempt to collect the higher, post-judgment rate of interest is flawed in several respects. Section 2—1303 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1303) permits interest at the rate of 9% to accrue on a final judgment from the date of its entry until the date of its payment, to compensate the judgment creditor for delays during which he is denied use of the judgment amount. (See *Carswell v. Rosewell* (1986), 150 Ill. App. 3d 168, 501 N.E.2d 695.) In the pending case, the final judgment referred to is the one entered on behalf of the injured party, Corral. Industrial was not the party-defendant in that lawsuit and therefore cannot be held liable for post-judgment interest on the $16 million judgment. As a judgment-debtor in the *pending* lawsuit, Indus-

trial's liability for post-judgment interest would not commence until September 27, 1989, the date on which the trial court entered final judgment.

■■■ We conclude that the post-judgment interest statute should not be expanded to require Industrial, a "stranger" to the personal injury judgment, to indemnify Vukmarkovic, the judgment-debtor, on the theory that its insured may become liable for post-judgment interest on the personal injury judgment.

For the foregoing reasons, we affirm the trial court's rulings in all respects.

Affirmed.

McMORROW, P.J., and JOHNSON, J., concur.