In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2662 & 99-3081

MUTUAL SERVICE CASUALTY
INSURANCE COMPANY, as subrogee of
JO DAVIESS SERVICES, INC.,

Plaintiff-Appellee,

v.

ELIZABETH STATE BANK,
an Illinois State Chartered Bank,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 97 C 5023--Philip G. Reinhard, Judge.

ARGUED MAY 9, 2000--DECIDED September 11, 2001

Before MANION, KANNE, and ROVNER, Circuit
Judges.

ROVNER, Circuit Judge.   In the course of
his employment with Jo Daviess Services,
Inc. ("Jo Daviess," or "the company"),
Arlyn Hemmen managed to misappropriate
more than $80,000 from the company's bank
account at the Elizabeth State Bank
("ESB" or "the bank"). Mutual Service
Casualty Company ("Mutual"), which
insured Jo Daviess, compensated the
company for its loss. Mutual then filed
suit against ESB, contending that the
bank had breached its contractual
obligations to Jo Daviess by
allowingHemmen to abscond with its funds.
The case proceeded to trial, and after
both parties had presented their cases,
Judge Reinhard entered judgment as a
matter of law in favor of Mutual. ESB
appeals, contending that Mutual was not
entitled to judgment as a matter of law
and that the prejudgment interest that
the district court awarded to Mutual was
inappropriate. We affirm the judgment in
Mutual's favor but remand for
recalculation of the award of prejudgment
interest.

I.

During the period of time relevant to this case, Jo Daviess was a farm service cooperative located in the northwestern Illinois community of Elizabeth, a town of approximately 700 people. Among other things, Jo Daviess sold animal feed, seed, fertilizer, and fuel to its members.

Late in 1991, the company hired Hemmen to serve as its controller. Hemmen previously had worked at a number of banks. In his capacity as controller, Hemmen maintained the company's books and accounts, reviewed and reconciled its bank statements, prepared monthly operating statements and other financial reports, and supervised his co-workers in the absence of the office manager.

While Hemmen was employed with the company, Jo Daviess maintained two accounts with ESB: an operating account, into which the company deposited all of its revenue and out of which it paid for its day-to-day expenses and any products the company purchased, and a second account reserved for the company's payroll. ESB maintained another account, referred to as the treasury tax and loan ("TT&L") account, into which the bank's commercial customers deposited the federal income tax that they withheld from their employees' paychecks; funds from this account were forwarded to the federal government on a daily basis. As needed, Jo Daviess periodically transferred funds out of its operating account into either the payroll or the TT&L account.

Pursuant to the terms and conditions of the agreement governing the operating account at ESB, only authorized signers could withdraw or transfer funds from that account. Joint Ex. 1, Tab 1 at 4. Hemmen was never a signer on the operating account. He did have the authority to sign checks drawn on the payroll account (Tr. 361/1)--a power that company officials could not recall him ever having exercised (Tr. 47, 266-67)--but witnesses from ESB as well as Jo Daviess agreed that Hemmen's status as a signer on one account did not authorize him to make withdrawals or transfers from another account. Tr. 160-61, 233, 325-26.

Although Hemmen was not a signer on the operating account, he regularly prepared

checks drawn on that account, both to pay Jo Daviess' suppliers and to transfer funds into one of the other accounts. These checks would be presented to the company's general manager for signature. On occasion, for purposes of transferring funds into the TT&L account, Hemmen would prepare a check payable to the order of ESB. Jo Daviess did not owe any money to the bank (Tr. 272-73), so the only legitimate reason for making a check payable to the bank would be to accomplish a transfer of funds from the operating account to the TT&L account. Tr. 124, 136, 138, 389.

The company kept a small amount of petty cash ($50 to $100) on hand in the office. This fund was primarily used to handle small, incidental expenses. Periodically a check would be drawn on the operating account to replenish that fund. Typically these checks were made out to "cash," "petty cash," or "Jo Daviess Service Company petty cash". On occasion, the check might be made payable to the bank, but if so, the check would bear a notation indicating that it was issued in order to "replenish petty cash." Tr. 37-38, 47, 139-141, 145-46, 199, 256-57, 273-74, 280, 387-89. In practice, Jo Daviess allowed both Hemmen and office secretaries to cash these checks, although none was a signer on the operating account. Tr. 275. Company officials never had any discussion with Hemmen regarding the limits of this authority. Tr. 369. However, the amount of such checks never exceeded the total amount of the petty cash fund; they typically ranged from $25 to $50. Pl. Ex. 19.

Beginning in January 1992, Hemmen began to embezzle money from Jo Daviess. Periodically, he would prepare a check on the company's operating account payable to the order of ESB, as if he were making a deposit into the TT&L account. He would then present the check to the general manager, who signed the check assuming that the proceeds were, indeed, destined for the TT&L account. Tr. 53-54, 110-13, 126, 392. So far as company officials were concerned, that was the only legitimate reason for preparing a check payable to the bank. Tr. 124, 136, 138, 389. In fact, however, Hemmen would divert the proceeds of the checks to his own use in one of several ways. On some occasions, Hemmen presented the check to

an ESB teller and requested that a portion of the check be deposited into the TT&L account, with the balance to be disbursed to him either in cash or one or more cashier's checks payable to Hemmen's creditors. On other occasions, Hemmen would present the check and have the entirety of the proceeds issued to him, again either in the form of cash or a cashier's check. Tr. 298-99. Bank personnel did not realize that Hemmen was diverting the proceeds to his own use; Hemmen would explain that the cash and cashier's checks were necessary in order to pay for supplies, parts or some other legitimate company expense. Tr. 385, 420. In case anyone at Jo Daviess should notice that not all of the check proceeds were being deposited into the TT&L account, Hemmen would make a false entry in Jo Daviess' internal records indicating that the cash or cashier's check issued to him was used to pay for something like postage, for example. Tr. 374, 377. "It was just a total fake, [a] total lie," Hemmen testified. Tr. 374; see also id. at 128. Indeed, Jo Daviess paid its obligations with cash or cashier's checks only on rare occasions. Tr. 87, 126, 282, 377-78, 383-84.

ESB was aware, of course that Hemmen was not an authorized signer on Jo Daviess' operating account (Tr. 195, 285), and Jo Daviess never indicated to the bank that Hemmen had authority to withdraw funds from that account (Tr. 43, 256, 286, 403). Nonetheless, the bank acceded to Hemmen's requests for cash and cashier's checks without first consulting with Jo Daviess to confirm his authority to receive the proceeds of these checks, and without even asking him to endorse the checks. In fact, it was the bank's custom during this period of time to honor such requests. So long as bank personnel knew the presenter, and so long as the check was signed by an authorized individual, the bank would disburse the proceeds of the check to the presenter notwithstanding the fact that the presenter himself was not an authorized signer. Tr. 161-62, 170, 402, 406. "We didn't question it if we knew them," explained one bank employee. Tr. 164. And the bank's personnel knew Hemmen--shortly after Jo Daviess had hired Hemmen, a company secretary who once had worked at ESB took him down to the bank and introduced him to the bank's staff. Tr.

397, 417. In short, there was nothing that Jo Daviess did or said that induced the bank to comply with Hemmen's requests; the bank simply did so in compliance with its usual practice. Tr. 165, 236, 256-57, 403, 433, 502. On the other hand, Jo Daviess officials had never discussed with ESB whether Hemmen could legitimately receive the proceeds of any checks payable to the bank. Tr. 76, 275, 277. "We weren't instructed whether he did or did not have authority to do that," said a bank official. Tr. 432. "There were no instructions." Id./2

Banking experts who testified on behalf of Mutual and ESB disagreed as to whether it was proper for ESB to honor the checks that Hemmen presented. Mutual's expert, Charles Malony, a banking official from the Chicago area, opined that it is bad form for a bank to negotiate a check that is payable to the bank's own order and that is presented to the bank by someone who is not a signer on the account. Tr. 321. The proper course of action for a bank to take in this situation, Malony believed, would be to send the presenter away or to contact an official of the drawer with signature authority in order to confirm the propriety of the transaction. Tr. 323-24. If the presenter is given cash, he ought in the least be required to sign the back of the check. Tr. 324. Moreover, the presenter's position with the drawer should have no bearing on his ability to receive the proceeds of such checks, Malony testified. Tr. 326. Malony was willing to acknowledge, however, that in practice, a bank that knows its customer well is more likely to be liberal in its policies. Tr. 342.

On the other hand, ESB's expert, Jeffrey Snyder, a banking official who had worked at a number of small-town banks, indicated that it is common for banks in small communities to rely on individuals who are not authorized signers for instructions as to the appropriate disposition of checks drawn to the bank's order. Tr. 486. Snyder acknowledged that "the bank has a responsibility to post [a] transaction as the drawer expects[.]" Id. But in practice, Snyder explained, the authorized signer typically is the owner of a business, who has better things to do with his or her time than to

traipse down to the bank. Typically, a bookkeeper or another employee is sent instead of an authorized signer. Id. In a larger metropolitan area, where a bank has no way of knowing each of the many persons who will transact business with it, bank employees will naturally be unwilling to accept instructions from non-authorized employees. Tr. 487, 492-93. But in a small community like Elizabeth, "we know all of these people," Snyder observed. Tr. 487. "We probably know who their parents were." Id.

And because we have that knowledge of our customers, it allows us to facilitate some of these transactions with the confidence that we're acting according to the instructions of the drawer. And we also know how these businesses--people run their businesses, and, you know, we have the confidence that if the business didn't intend to have that person tell us what to do with the item, they wouldn't have signed it and sent them down there with it.

Id. Thus, so long as the bank is familiar with the presenter and knows that he is the drawer's employee, and in the absence of any suspicious circumstances, a small-town bank in practice likely will honor the presenter's instructions-- including an instruction to issue cash to the presenter himself. Tr. 490. This amounts to a judgment call on the part of the bank employee to whom the item is presented, Snyder said (Tr. 493-94), turning on such factors as one's familiarity with the presenter, the length of time he has been employed by the drawer, his position with the drawer, and the amount of money involved in the transaction (Tr. 501-02).

Taking advantage of the small-town practice that Snyder described, Hemmen managed to embezzle approximately $83,000 from Jo Daviess over a three-year period. There was nothing irregular on the face of the checks themselves, and the monthly bank statements that the bank mailed to Jo Davies revealed appropriate debits to the company's operating account. Tr. 59-60, 126, 288-89, 392. As far as Jo Daviess personnel knew, 100 percent of the proceeds of these checks were being transferred into the TT&L account. Tr. 43-54, 126. Company officials did no checking of their own to make sure that

the proceeds of the checks were being handled as Hemmen had led them to believe; they trusted him. Because the bank never notified Jo Daviess that Hemmen was instead receiving cash and cashier's checks, and did not confirm his authority to do so, the company remained ignorant of Hemmen's embezzlement. Tr. 43, 169-70, 238, 380-81. Not until an outside audit was performed in February of 1995 did Jo Daviess discover what Hemmen had done. After coming across a check that had been recorded as a deposit to the TT&L account, auditors discovered that some cash had been returned to the presenter. The disbursement of cash struck the auditors as unusual, and they undertook a comprehensive review of all checks that culminated in the discovery of Hemmen's malfeasance. Tr. 296.

Jo Daviess submitted a claim to its insurer, Mutual, which paid the company a total of $82,963. Mutual, as Jo Daviess' subrogee, in turn filed this action against the bank, seeking reimbursement on alternative theories of breach of contract (based on the deposit agreement) and negligence. Mutual eventually conceded that the negligence claim was barred by the economic loss doctrine articulated in Moorman Mfg. Co. v. National Tank Co., 435 N.E.2d 443 (Ill. 1982), and the district court entered summary judgment in the bank's favor on that claim. R. 18. The breach of contract claim proceeded to trial.

ESB attempted to pursue a number of defenses to the contract claim that the district court, in advance of trial, determined not to be viable as a matter of law. First, ESB wished to show that it had taken the checks underlying Mutual's claim as a holder in due course, and that as a result it took those checks free of all claims--including Mutual's claim for breach of contract. Judge Reinhard deter mined, however, that the bank could not qualify as a holder in due course because the checks were drawn to the order of the bank, and ESB had distributed the proceeds of the checks to a presenter who lacked authority to withdraw funds from the account. June 10, 1999 Tr. 17. Second, ESB sought to prove that Hemmen was a fiduciary who was empowered to instruct the bank as to the disposition of proceeds of checks made payable to the bank, and that, consequently, under the

Illinois Fiduciary Obligations Act, ESB was not liable for Hemmen's misdeeds unless it acted in bad faith. This defense was not viable, the district judge reasoned, because there was no evidence that would permit the jury to find Hemmen qualified as a fiduciary vis a vis checks drawn to the bank's order. Hemmen was not an authorized signer on the operating account, and thus had no authority to receive the proceeds of these checks. May 26, 1999 Tr. 8, 13, 14-15, 18-19. Third, under a theory of pure comparative negligence, ESB wished to show that Jo Daviess' own negligence in employing Hemmen, placing him in charge of the company's financial record-keeping, and in its handling of the checks that Hemmen made payable to the bank's order, was a substantial cause of the company's (and hence Mutual's) loss and therefore reduced ESB's liability. But Judge Reinhard concluded that a defense based on comparative negligence was not available to ESB given its written deposit agreement with Jo Daviess, which agreement did not authorize Hemmen to withdraw funds from the operating account. May 26, 1999 Tr. 8-9. Fourth, ESB posited that as a compensated insurer, Mutual could not recover the monies it paid to Jo Daviess from a party like the bank, whose equities (in the bank's view) were equal or superior to those of Mutual. Judge Reinhard concluded that Illinois did not recognize this defense. May 26, 1999 Tr. 6-7.

With these defenses eliminated, ESB resisted liability at trial on two principal theories. First, in the bank's view, the facts did not establish a breach of any contractual duty owed to Jo Daviess. ESB pointed out that nothing in the deposit agreement specifically addressed the bank's responsibility with respect to checks payable to itself. It further relied on the testimony of Snyder, as well as the testimony of its own officials, for the proposition that reasonable banking practice in small communities permits a bank to release funds to a known employee of the drawer even when that employee is not formally authorized to withdraw funds from an account. Second, ESB contended that Hemmen had either actual or implied authority to receive funds from Jo Daviess' operating account and that the

bank had reasonably relied on that authority in disbursing the proceeds of the checks in question to him.

At the close of evidence, and before the case was submitted to the jury, Judge Reinhard concluded that Mutual was entitled to judgment as a matter of law. As a threshold matter, he determined that ESB had a duty, founded on the terms of the deposit agreement as well as the case law, not to disburse the proceeds of a check drawn to the bank's order to anyone other than an authorized signer. Thus, when Hemmen presented such a check to ESB, the bank ought either to have refused the check altogether, accepted it for deposit only, or held the check until such time as an authorized signer presented the check with instructions as to the appropriate disposition of the check proceeds. By electing instead to honor Hemmen's requests for cash and cashier's checks, ESB had breached that duty. Tr. 506-07. Judge Reinhard rejected the notion that a bank's duty vis a vis checks payable to its own order might be different in a small town than it was elsewhere. The same rule must apply everywhere, he reasoned, lest the law of negotiable instruments be placed in jeopardy. Tr. 506. Finally, he found that the facts precluded ESB's attempted resort to the theory that Hemmen had actual or implied authority to receive the proceeds of the checks in question. The testimony revealed that ESB made it a practice to release funds to the known employees of its commercial customers, the judge pointed out. Consequently, the bank could not show that it relied on any authority Hemmen might have possessed in releasing the check proceeds to him. Tr. 505.

With the question of ESB's liability resolved, the parties quickly stipulated as to the amount of damages. Mutual had claimed total damages of $83,790.48, an amount slightly greater than the sum it paid to Jo Daviess. At trial, questions had arisen as to whether two of the checks that Hemmen had prepared and for which cash had been disbursed--one in the amount of $1,000 and the other for $89-- might have been for legitimate company purposes. Mutual agreed to drop these checks from its claim and ESB stipulated that the balance of $82,701.48 represented the amount for which it was

liable. Tr. 507-08. The court entered judgment in that amount. R. 43, 44.

Mutual subsequently asked the court to modify the judgment to include an award of prejudgment interest. As the starting point for running of such interest, Mutual used the dates that its insured incurred the loss on each of the checks-- i.e., the dates on which the bank wrongfully disbursed the check proceeds to Hemmen. Over ESB's objection, the district court granted Mutual's request in full and revised the judgment to include prejudgment interest of $25,841.55. R. 60, 61.

II.

The bulk of ESB's arguments on appeal fall into two principal categories--those directed at the validity and sufficiency of Mutual's claim for breach of contract and those focused on the defenses that the district court rejected. Within the first category, there are three contentions that ESB makes: (1) that the Uniform Commercial Code has displaced the common-law underpinnings of Mutual's claim; (2) that Mutual's claim for breach of contract is at bottom a negligence claim, and as such is barred by the Illinois Supreme Court's decision in Moorman Mfg. Co. v. National Tank Co., 435 N.E.2d 443 (Ill. 1982); and (3) that the evidence with respect to banking practice in small communities at the very least raised a question of fact as to whether ESB breached any duty to Jo Daviess by negotiating the checks drawn to its own order. As for the second category, ESB argues that Judge Reinhard erred in summarily rejecting three of its proffered defenses: (1) the holder-in- due-course defense; (2) its defense under the Illinois Fiduciary Obligations Act; and (3) the compensated surety defense. Finally, as we mentioned at the outset, ESB also contends that the award of prejudgment interest was inappropriate for a variety of reasons.

Federal Rule of Civil Procedure 50 authorizes a court to enter judgment as a matter of law against a party "if . . . a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]" Fed. R. Civ. P. 50(a)(1). Our review of

the court's decision to grant judgment as a matter of law against ESB is, of course, de novo. Honaker v. Smith, 256 F.3d 477, 483 (7th Cir. 2001). "Judgment as a matter of law is proper only if a reasonable person could not find that the evidence supports a decision for a party on each essential element of the case, viewing the evidence in the light most favorable to the nonmovant." Campbell v. Peters, 256 F.3d 695, 699 (7th Cir. 2001), citing Jones v. Western & Southern Life Ins. Co., 91 F.3d 1032, 1036 (7th Cir. 1996). Looking at the totality of the record before the court, we must therefore consider whether there was sub stantial evidence--more than a mere scintilla--that would have permitted the jury to find in the bank's favor on the breach of contract claim. Honaker, 256 F.3d at 483.

As for the defenses that the district court barred ESB from pursuing at trial, our review is again de novo. United States v. Santiago-Godinez, 12 F.3d 722, 726 (7th Cir. 1993), cert. denied, 511 U.S. 1060, 114 S. Ct. 1630 (1994). The district judge determined that each of these defenses was not viable given the nature of Mutual's claim and the evidence that ESB proffered in support of the defense. In our plenary review of these assessments, we must consider whether the relevant law recognizes the defense that ESB wished to pursue and, if so, whether the evidence that the bank elicited, or wished to elicit, in support of the defense would have permitted the jury to find in ESB's favor.

As this is a diversity case, we look to state law for the substantive legal principles. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938). The parties agree that the law of Illinois should govern, and we have no reason to quarrel with that assessment. The contract underlying Mutual's claim was entered into in Illinois by two Illinois businesses for a bank account at an Illinois bank. See, e.g., Employers Ins. of Wausau v. Ehlco Liquidating Trust, 723 N.E.2d 687, 694-95 (Ill. App. 1999) (setting forth Illinois choice-of-law rules for contract actions). To the extent that the Illinois Supreme Court has not yet spoken to any of the issues before us, we shall apply the law as we predict the Illinois Supreme Court would

if it were deciding the case. Help At Home Inc. v. Medical Capital, L.L.C., 2001 WL 902462, at *3 (7th Cir. Aug. 7, 2001), citing Brunswick Leasing Corp. v. Wisconsin Central, Ltd., 136 F.3d 521, 527 (7th Cir. 1998).

A.

The commercial deposit agreement that governed Jo Daviess' operating account with the bank permitted only authorized signers to withdraw funds from that account. Hemmen, of course, was not an authorized signer; so had the bank, for example, negotiated checks on the operating account that Hemmen had signed, there would be no question that it would be liable for breach of the deposit agreement. See, e.g., Menerey v. Citizens First Nat'l Bank, 513 N.E.2d 553, 554 (Ill. App. 1987) (bank breached its contract with depositor by releasing funds on one signature alone when agreement required two). But instead, Hemmen used a time-honored method of circumnavigating the signature requirement, by preparing checks payable to the bank and having them signed by an authorized company official, and then directing the bank to issue cash or cash ier's checks to him in return.

Although the deposit agreement did not specify how the bank was to handle checks made payable to its own order, implicit in the duty of care that the bank owed to Jo Daviess by virtue of the deposit agreement, see id., was an obligation to verify that Hemmen had the authority to receive the proceeds of such checks and that his instructions vis a vis those proceeds conformed to Jo Daviess' wishes. The rule is well-recognized:

Where a check drawn to the order of a bank is presented to such bank, and the drawer owes no [debt] to the bank, the bank must see that the proceeds are not misapplied, and cannot without justification divert the proceeds to the use of one other than the drawer, and is authorized to pay the proceeds only to persons specified by the drawer. The bank takes a risk in treating the check as being payable to the bearer, and is placed on inquiry as to the authority of the drawer's agent to receive payment. The duty to inquire of the drawer is not satisfied by making inquiry of the

bearer. If the bank assumes without investigation that the instructions of the presenter are those of the drawer, it takes a risk. Where the drawer's agent or one representing himself or herself to be such is not in fact authorized, the bank is liable to the drawer for paying the check to such person . . . .

9 C.J.S. Banks and Banking sec. 327, at 316-17 (1996) (footnotes omitted); see also Boyd J. Peterson, Annotation, Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order by Drawer Not Indebted to Bank, 69 A.L.R. 4th 778 (1989). This rule derives from the position of trust that the bank occupies with respect to funds that it has invited its customers to place in its custody.

The public is invited to use [the bank's] conveniences as places of deposit; it holds itself out as trustworthy for such purposes; when it is named as the payee in a check by a party not indebted to it, it will be presumed that it accepts the same subject to the directions of the drawer and not to the directions of a stranger to the paper who happens to present it.

Douglass v. Wones, 458 N.E.2d 514, 522 (Ill. App. 1983), quoting Milano v. Sheridan Trust & Sav. Bank, 242 Ill. App. 362, 368, 1926 WL 3944, at *3 (Ill. App. 1926). Put another way, when a drawer owes nothing to a bank but writes a check payable to the bank's order, the drawer places that check in the bank's custody, with the expectation that the bank will negotiate the check according to the drawer's wishes; the bank may not, therefore, treat the check as bearer paper and blindly disburse the proceeds according to the instructions of any individual who happens to present the check to the bank. E.g., Master Chem. Corp. v. Inkrott, 563 N.E.2d 26, 28-29 (Ohio 1990). As Wones reflects, Illinois has long embraced this common-law rule. See People ex rel. Nelson v. Peoples Loan & Trust Co., 2 N.E.2d 763, 765 (Ill. App. 1936); People ex rel. Nelson v. Peoples Bank & Trust Co. of Rockford, 271 Ill. App. 41, 46, 1933 WL 4479, at *2 (Ill. App. 1933); Paine v. Sheridan Trust & Sav. Bank, 255 Ill. App. 250, 260, 1929 WL 3406, at *4-*5 (Ill. App. 1929), aff'd, 174 N.E. 368 (Ill. 1930); Milano,

242 Ill. App. at 368, 1926 WL 3944, at *3; see also Terre Haute Indus., Inc. v. Pawlik, 765 F. Supp. 925, 930 (N.D. Ill. 1991). The Land of Lincoln is by no means an exception in that regard. "This general proposition enjoys the unwavering support of a vast body of judicial opinion originating both before and after the creation of the U.C.C." Bullitt County Bank v. Publishers Printing Co., 684 S.W.2d 289, 292 (Ky. App. 1984); see also, e.g., Dalton & Marberry, P.C. v. NationsBank, N.A., 982 S.W.2d 231, 233-34 & n.2 (Mo. 1998); Allis Chalmers Leasing Servs. Corp. v. Byron Ctr. State Bank, 341 N.W.2d 837, 839 (Mich. App. 1983); Sun 'n Sand, Inc. v. United California Bank, 148 Cal. Rptr. 329, 344-45 (Cal. 1978) (Mosk, J.); Bank of Southern Maryland v. Robertson's Crab House, Inc., 389 A.2d 388, 393 (Md. Ct. Spec. App. 1978); Transamerica Ins. Co. v. U.S. Nat'l Bank of Oregon, 558 P.2d 328, 333 (Ore. 1976).

The evidence admits of no doubt that ESB breached its obligation to ensure that the proceeds of the checks payable to the bank's order were not misapplied. Never did the bank bother to inquire of a Jo Daviess official (someone other than Hemmen himself, of course) whether Hemmen's instructions as to the disposition of these checks were appropriate. Conversely, Jo Daviess never gave the bank any reason to believe that Hemmen was empowered to receive the proceeds of checks made payable to the bank. The bank, aware that Hemmen was the company's controller, simply assumed that he was acting within the scope of his authority. Yet, as the Illinois Supreme Court has observed in a similar context:

Persons dealing with an assumed agent are bound, at their peril, to ascertain, not only the fact of the agency, but the extent of the agent's authority. They are put upon their guard by the very fact that they are dealing with an agent, and must, at their peril, see to it that the act done by him is within his power.

Paine, 174 N.E.2d at 370; see also Bullitt, 684 S.W.2d at 293. This the bank failed to do.

B.

The bank suggests that the common-law

duty of care on which Mutual's claim is based has been superseded generally by the Uniform Commercial Code, but we find nothing in the UCC, as adopted by the Illinois legislature, that displaces the common-law rule. The Code itself provides for supplementation by common-law principles, "[u]nless displaced by the particular provisions of this Act." 810 Ill. Comp. Stat. 5/1-103. Although the scheme perpetrated by Hemmen is a common one, no provision of the Code delineates what a bank's rights and obligations are when a person presents a corporate check payable to the bank and instructs the bank to divert the proceeds of the check to his own benefit. See Bullitt, 684 S.W.2d at 291. As we noted earlier, the common-law rule governing this situation springs from the duty of care that the bank owes its depositors. The Code provisions governing the relationship be tween a bank and its customer recognize and embrace that duty. See, e.g., 810 Ill. Comp. Stat. 5/4-103, 5/4-406; see also 810 Ill. Comp. Stat. 5/3-103(7) (defining "ordinary care"); Bullitt, 684 S.W.2d at 291-92; Robertson's Crab House, 389 A.2d at 392-93. Indeed, although the Code per mits contracting parties to vary the effect of those provisions by agreement, it expressly disallows any term which purports to "disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." 810 Ill. Comp. Stat. 5/4-103(a); see Robertson's Crab House, 389 A.2d at 392-93, quoting Gillen v. Maryland Nat'l Bank, 333 A.2d 329, 333 (Md. 1975); Inkrott, 563 N.E.2d at 28. Accordingly, courts throughout the country have continued to apply the common-law rule on which Mutual's claim is founded notwithstanding the advent of the UCC. See, e.g., Govoni & Sons Constr. Co. v. Mechanics Bank, 742 N.E.2d 1094, 1100 n. 15 (Mass. App. 2001) ("The cases following this rule, both before and after the emergence of the code, are legion."); see also Federal Ins. Co. v. NCNB Nat'l Bank of North Carolina, 958 F.2d 1544, 1550 (11th Cir. 1992); Dalton & Marberry, 982 S.W.2d at 234; Bullitt, 684 S.W.2d at 292; Robertson's Crab House, 389 A.2d at 393; Transamerica Ins. Co., 558 P.2d at 333. No court that we are aware of has found the rule to be inconsistent with any provision of the Code.

C.

The bank's next argument rests on the Illinois Supreme Court's decision in Moorman Mfg. Co. v. National Tank Co., 435 N.E.2d 443 (Ill. 1982). Moorman held that recovery for a loss that is solely economic in nature must be had in contract rather than in tort. Moorman itself was a products liability case, of course, but its ruling has since been ex tended to the provision of services as well. See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 636 N.E.2d 503, 513-14 (Ill.), cert. denied, 513 U.S. 947, 115 S. Ct. 358 (1994); Collins v. Reynard, 607 N.E.2d 1185, 1187-88 (Ill. 1992) (Miller, J., concurring). "In essence, the economic loss, or commercial loss, doctrine denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations." Id. at 1188 (Miller, J., concurring). As we have noted, Mutual conceded below that Moorman barred its negligence claim against the bank (R. 12 at 2-3) and proceeded with its claim for breach of contract. The bank, however, insists that no matter what label one affixes to it, Mutual's claim is at bottom a negligence claim; and, indeed, the cases usually refer to the claim as one for negligence rather than for breach of contract. E.g., Milano, 242 Ill. App. at 367, 370, 1926 WL 3944, at *3, *5; see also Dalton & Marberry, 982 S.W.2d at 237; Sun 'n Sand, 148 Cal. Rptr. at 344. The fact that Mutual nominally sought and obtained relief for breach of contract consequently does not obviate the Moorman problem, in the bank's view.

We shall assume for the sake of argument that Mutual's claim is indeed one for economic losses within the scope of Moorman and its progeny. Even so, we discern no barrier in Moorman to the relief that Mutual obtained. Because Mutual's claim is founded on a duty that was implied in the contract between the bank and Jo Daviess, we believe that Mutual was free to seek relief for its loss either in contract or in tort.

The bank's liability in this case rests on the duty of care that it owed to Jo Daviess by virtue of the contract between the two of them. The deposit agreement,

as we have noted, did not expressly define the parties' obligations with respect to checks drawn to the order of the bank. But the common law imposed on the bank a duty of care to its depositor, and that implied duty included the obligation to see that the proceeds of checks payable to the bank (and not in satisfaction of any debt to the bank) were not misapplied. Founded as it is upon the breach of a duty of care imposed by law, Mutual's claim sounds very much like one for negligence; and thus it is no surprise to see the claim often described as a tort claim. But the duty of care is one implied into the agreement between bank and depositor; it is a duty, in other words, that depends upon the existence of a contract. Illinois courts have long recognized that such implied contractual duties will support recovery in either contract or tort. As the Illinois Supreme Court explained more than 100 years ago:

[N]othing is better settled than that in many contracts, especially those which establish peculiar relations between the parties, as, those of confidence and trust, the law silently annexes certain conditions, and imposes mutual obligations and duties, which are not all, in express terms, provided for in the contract, yet in contemplation of law, they are nevertheless regarded as part of the contract, and the non-performance of them may, in an action on the contract, be assigned as a breach thereof. But while assumpsit [i.e., a contract claim] will certainly lie for a breach of these duties, it is equally well settled that case [i.e., a tort claim] will lie also. Strictly speaking, these duties arise ex lege out of the relation created by the contract. As familiar illustrations of this class of contracts, which give rise to an almost infinite variety of implied duties and obligations, may be mentioned those between client and attorney, physician and patient, carrier and shipper, and, in short, every species of bailment. In all these and analogous cases it is conceded case is a concurrent remedy with assumpsit for a breach of the implied duties growing out of any of these relations.

Nevin v. Pullman Palace Car Co., 106 Ill. 222, 233, 1883 WL 10204, at *5 (Ill.

1883); see also Ledingham v. Blue Cross Plan for Hospital Care of Hospital Serv. Corp., 330 N.E.2d 540, 544 (Ill. App. 1975) ("It is clear in Illinois that where both a tort and a contract cause of action arise out of the same fact situation, the plaintiff is free to proceed with the theory of his choice."), rev'd on other grounds, 356 N.E.2d 75 (Ill. 1976); cf. Selcke v. New England Ins. Co., 995 F.2d 688, 689 (7th Cir. 1993) ("[a] suit to enforce an implied term is a suit that arises under the contract"; hence, pursuant to clause in parties' agreement calling for arbitration of disputes as to proper interpretation of contract, dispute over contractual term implied by Illinois statute was subject to arbitration); Merrill Tenant Council v. U.S. Dep't of Housing & Urban Dev., 638 F.2d 1086, 1089-90 (7th Cir. 1981) (duty imposed upon landlord by Illinois statute to pay interest on tenant's security deposit became implied term of lease agreement, and tenants could sue in contract rather than tort for breach of that term). Thus, even if Moorman did preclude Mutual from suing the bank in tort, nothing prevented Mutual from alternatively pursuing relief in contract for breach of the bank's implied duty of care. See Calcagno v. Personalcare Health Mgmnt., Inc., 565 N.E.2d 1330, 1339 (Ill. App. 1991) (although Moorman barred insureds' common-law claims against insurer to extent such claims were premised on negligence or wilful or wanton breach of contract, insureds were nonetheless free to pursue contract action based on breach of implied covenant of good faith and fair dealing); see also Gillen v. Maryland Nat'l Bank, supra, 333 A.2d at 333 ("a depositor may sue in an action for breach of contract to enforce the bank's contractual obligation to use ordinary care").

Yet, we are not so sure that Moorman would have barred a tort claim against the bank in any event. In confining recovery for economic losses to the realm of contract law, the Illinois Supreme Court in Moorman sought to maintain the integrity of a "carefully articulated" body of rules in the UCC governing the sale of goods. 435 N.E.2d at 447. The rules included a number of provisions regarding express and implied warranties, disclaimers, the extent of a

manufacturer's liability, and the period of time during which a manufacturer might be sued. See id. "These rules determine the quality of the product the manufacturer promises and thereby determine the quality he must deliver." Id., citing Seely v. White Motor Co., 403 P.2d 145, 150 (Cal. 1965) (Traynor, C.J.). Significantly, the UCC also allowed the contracting parties either to limit warranties or to eliminate them altogether. Id. Thus, in the court's view, subjecting a manufacturer to tort liability on theories of strict liability or negligence, threatened to disturb the law of sales by eliminating the ability of the parties to contractually limit a manufacturer's liability, by subjecting a manufacturer to suit by parties with whom it was not in privity, and exposing it to liability "for damages of unknown and unlimited scope." Id.

The duty of care underlying Mutual's claim, on the other hand, is not a duty that is foreign to the UCC. It is not only a duty that is embraced in several UCC provisions, as we noted above, but it is a duty that the UCC expressly forbids the parties from disavowing. 810 Ill. Comp. Stat. 5/4-103(a). As we have noted, the UCC also embraces common-law principles to the extent that they do not conflict with the express terms of the Code. 810 Ill. Comp. Stat. 5/1-103. Because the common-law rule obligating a bank to ensure that the proceeds of a check payable to the bank are not misapplied conflicts with no provision of the Code that we can find, the concern underlying the Moorman rule is not present here. See Maxfield v. Simmons, 449 N.E.2d 110, 111-12 (Ill. 1983) (concluding that Moorman did not bar contractor's third-party claim for indemnity against supplier, because no provision of UCC purports to control issue of indemnity).

Indeed, more recent cases from the Illinois Supreme Court suggest that a claim for economic loss may be pursued in tort as well as contract where, as here, the claim is founded on a duty of care that the law imposed on the defendant irrespective of the terms of the contract. In Collins v. Reynard, supra, a client filed a malpractice action against her attorney, alleging that the lawyer had caused her to suffer a financial loss by drafting certain sales documents in a

manner that failed to protect her security interest in the property being sold. The supreme court rejected the notion that Moorman barred the tort claim. Although the court acknowledged that logic might support the application of Moorman to this situation, it cited a long line of Illinois precedents allowing recovery in tort for attorney malpractice as sufficient reason not to extend the Moorman rule to the realm of attorney-client relations. 607 N.E.2d at 1186. "Logic may be a face card but custom is a trump," the court observed. Id. A concurring opinion in Collins, embraced by four of the court's seven justices, pointed out that the Moorman rule is premised on the notion that the parties to a commercial transaction are free to bargain for warranties regarding the quality of goods and services rendered; but a person who engages an attorney invariably does so with the expectation that lawyer will serve her with reasonable skill and ability. Id. at 1189 (Miller, J., concurring). Indeed, tort law has long imposed a duty of competence upon the attorney "without regard to the terms of any contract of employment entered into by a lawyer and his client." Id. at 1189. Consequently, the concurring judges concluded, "[t]he attorney-client relationship is not the sort of commercial context in which limits on the recovery of economic losses are either necessary or properly applied." Id.

In Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., supra, Illinois' high court similarly declined to extend the Moorman doctrine to accountant malpractice. Taking up where the concurrence in Collins left off, the court stated that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." 636 N.E.2d at 514. In the court's view, the duty of care that an accountant owes his client, like the duty that the lawyer owes her client, is one such an extra-contractual duty:

While a client contracts with an accountant regarding some general matters, an accountant must make his own decisions regarding many significant matters, and the final decision he makes is not necessarily contingent on the contract he executes with his client. An

accountant may offer different levels of service, such as audited or unaudited preparation of financial statements, but within these levels of service, the client is not required or expected to be able to direct the conduct of the accountant through contractual provisions. A client should know that an accountant must make certain decisions independently, and the client had the right to rely on the accountant's knowledge and expertise when those decisions are made by the accountant. This knowledge and expertise cannot be memorialized in contract terms, but is expected independent of the accountant's contractual obligations.

Id. at 514-15. In short, when an accountant commits malpractice, he breaches a "duty of reasonable professional competence" that the law imposes without regard to the particular terms of the contract with his client. Id. at 515. "Allowing plaintiff to recover its losses in tort, therefore, is consistent with the economic loss doctrine announced in Moorman." Id.

Congregation of the Passion's rationale suggests that a bank's failure to observe ordinary care in handling its customer's transactions may support a tort claim notwithstanding Moorman's commercial loss doctrine. As with attorneys and accountants, the law has long imposed on banks a duty of reasonable care, e.g., Menerey v. Citizens First Nat'l Bank, supra, 513 N.E.2d at 554, and that duty is so entrenched that the UCC does not permit the parties to a banking contract to abandon it. 810 Ill. Comp. Stat. 5/4-103(a). Careful handling of checks drawn to the bank's order is but one facet of this duty of care, and one that has long been recognized throughout the country. Arguably, then, a breach of that duty would support a negligence claim in Illinois. We need not decide that question definitely, for we think it clear that Mutual was free to sue the bank in contract even if Moorman foreclosed the negligence claim. (And Illinois law by no means is without uncertainty in this area. See Serfecz v. Jewel Food Stores, Inc., 1998 WL 142427, at *4 (N.D. Ill. Mar. 26, 1998).) But because the type of claim that Mutual asserts in this case is usually understood and analyzed as a negligence

claim, and because the bank insists that the contract claim is merely a sham to evade Moorman, we think it useful to point out that the implied duty underpinning Mutual's claim is one that may well support an exception from Moorman of the kind that the Illinois Supreme Court recognized in Collins and Congregation of the Passion.

D.

In an effort to fend off a finding that the bank had breached its contractual duty of care, ESB emphasized below that Elizabeth is a small town and posited that the duty of care on which Mutual's claim is founded must be defined with reference to small-town norms. Recall that Snyder, the bank's expert, testified that is a common practice for banks in small communities to honor a check drawn to the order of the bank when the presenter is known to the bank's staff. Informal practices like this one serve to facilitate the transaction of business by the bank's customers, he explained. Tr. 485-86. Thus, in ESB's view, a small-town bank ought not be obliged to verify the presenter's authority to receive or disburse the proceeds of a check payable to the bank when bank personnel know the presenter, as they did in this case.

Judge Reinhard properly rejected the effort to modify or limit the bank's duty of care when he found, as a matter of law, that ESB had breached its contract with Jo Daviess. The bank cites no case which recognizes an exception to the common-law rule based on the size of the community, the idiosyncracies of local banking practice, or the bank's familiarity with the presenter, and we have found none. Judge Reinhard reasoned that the rule must be uniform, Tr. 501, and he was right. The duty of care underlying the rule is one which inheres in every agreement between a bank and its depositor, and over the past century courts have given that rule a clear, simple, and consistent meaning with respect to checks payable to the order of the bank. Indeed, the UCC, to which the bank looks for a number of its appellate arguments, states that one of its purposes is "to make uniform the law among the various jurisdictions." 810 Ill. Comp. Stat. 5/1-102(c); see also Official UCC Comment regarding 1990 Revision of

Article 3, 810 Ill. Comp. Stat. Ann., Act 5, Art. 3 (1993) (immediately preceding 5/3-101) ("The law for payments through checks and which governs other negotiable instruments . . . should be uniform and up-to-date, either through state enactments or Federal preemption. Otherwise, checks as a viable payment system in international and national transactions will be severely hampered and the utility of other negotiable instruments impaired."). The obligation imposed by the common-law rule is not onerous. See Sun 'n Sand, Inc. v. United California Bank, supra, 148 Cal. Rptr. at 346. The very face of the check--payable, as it is, to a bank which is owed nothing by the drawer--alerts the bank to the need for caution. Paine v. Sheridan Trust & Sav. Bank, supra, 255 Ill. App. at 261, 1929 WL 3406, at *5. The rule simply requires the bank "not [to] ignore the danger signals inherent in such an attempted negotiation." Sun 'n Sand, 148 Cal. Rptr. at 346. We are given no reason to believe that a small-town bank will have a more difficult time than any other bank in verifying the presenter's authority to receive or disburse the proceeds of such a check--if anything, it ought to be easier for a bank in a small community to do so.

E.

Generally speaking, one who takes a negotiable instrument for value, in good faith, and without notice of any claim or defense to the instrument, acquires the rights of a holder in due course. See 810 Ill. Comp. Stat. 5/3-302. As such (with certain exceptions), he holds the instrument free of all claims either to the instrument or its proceeds. See 810 Ill. Comp. Stat. 5/3-302, 5/3-306; e.g., Farmers State Bank of Somonauk v. National Bank of Earlville, 596 N.E.2d 173, 174 (Ill. App. 1992). In the court below, the bank wished to establish that when it negotiated the Jo Daviess checks that Hemmen presented, it became a holder in due course and was therefore shielded from Mutual's common-law claim. More particularly, it was the bank's theory that Hemmen had breached a fiduciary duty to Jo Daviess by diverting the proceeds of the checks to his own use. In the bank's view, Hemmen's status as a fiduciary brought UCC section 3-307 into play. The terms of that section would

have protected the bank so long as it lacked knowledge of the facts constituting his breach of fiduciary duty. See 810 Ill. Comp. Stat. 5/3-307(b)(4). However, the district judge ruled in advance of trial that section 3-307 was inapplicable, because Hemmen did not have authority to receive the proceeds of checks payable to the bank under any circumstance, and so was not a fiduciary in that regard. May 26, 1999 Tr. at 18-19. Judge Reinhard also concluded that the holder-in-due-course defense is not available when a bank permits an individual like Hemmen to divert the proceeds of a check payable to the bank to the use of someone other than the drawer. June 10, 1999 Tr. at 17.

On appeal, the bank relies on the holder-in-due-course provisions of the Code to make two arguments. The bank suggests first that three provisions of the Code--sections 3-302, 3-306, and 3-307--comprehensively address the fraudulent-check scenario presented here and so foreclose Mutual's common-law claim. Alternatively, the bank contends that these provisions supply it with a meritorious defense to the claim, and that Judge Reinhard erred when he excluded the holder-in-due-course concept from the case. Before we turn to these arguments, a brief overview of the provisions on which the bank relies is appropriate.

Each of the three Code provisions that the bank invokes relates either to the rights that a holder in due course enjoys or the conditions under which he qualifies as a holder in due course. Section 3-306 sets forth a basic rule addressing competing claims to a financial instrument or its proceeds:

A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having the rights of a holder in due course takes free of the claim to an instrument.

810 Ill. Comp. Stat. 5/3-306. Section 3-302(a) in turn spells out the criteria for identifying a holder in due course:

. . . "[H]older in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity, and

(2) the holder took the instrument (i) for value, (ii) in good faith, . . . [and] (v) without notice of any claim to the instrument described in Section 3-306 . . . .

810 Ill. Comp. Stat. 5/3-302(a). Finally, section 3-307 deals with a subset of claims under section 3-306 involving a fiduciary who causes the proceeds of an instrument to be misapplied. See 810 Ill. Comp. Stat. 5/3-307, UCC Official Comment 2. Specifically, this provision spells out the various circumstances under which the holder of an instrument (including a bank) can be said to have taken the instrument with notice of the breach of fiduciary duty, such that the holder cannot assert the rights of a holder in due course. See id. As relevant here, the provision requires the holder to have knowledge of (1) the fiduciary status of the person from whom it took the instrument and (2) the facts indicating a breach of fiduciary duty. See 5/3-307(b)(4) & UCC Official Comment 2.

As we have said, the bank's first contention is that these interacting provisions of the Code specifically address the scenario presented in this case, and in so doing displace the common-law claim that Mutual has asserted. This particular displacement argument is not one that the bank made below, however, and so we need not, and do not, undertake to resolve this argument on its merits. See, e.g., Frobose v. American Sav. & Loan Ass'n of Danville, 152 F.3d 602, 613 (7th Cir. 1998) (noting that "[t]he plain error doctrine has an extremely narrow application to civil cases"). We do take the opportunity to make two observations in this regard. First, although the three provisions that the bank has cited describe in some detail the circumstances under which the holder takes an instrument free of claims, they are

largely silent as to the types of claims that may be asserted when the holder-in-due-course criteria are not satisfied. Section 3-306, for example, indicates simply that a person who is not a holder in due course takes an instrument "subject to a claim of a property or possessory right in the instrument or its proceeds." 810 Ill. Comp. Stat. 5/3-306. The commentary to section 5/3-307 reveals that a claim founded on a breach of fiduciary duty would be one that could be asserted under section 3-306, see 810 Ill. Comp. Stat. 5/3-307, Official UCC Comment 2, but the Code otherwise offers little elucidation as to the scope of the claims that may be characterized as claims "of a property or possessory right in the instrument or its proceeds," and it does not undertake to identify the elements of such claims. Moreover, assuming that the facts in this case would permit Mutual to assert a claim under section 3-306, the bank has made no attempt to show how and why the common-law claim that Mutual has asserted might be inconsistent with relief under the Code. In short, the case for displacement is anything but obvious, as the courts' continued reliance on the common-law rule itself suggests.

As for the bank's alternative argument, we agree with Judge Reinhard that the nature of Mutual's claim renders the holder-in-due-course defense inapplicable as a matter of law. In order for the bank to qualify as a holder in due course, it must have negotiated the checks without notice of Jo Daviess' (and hence Mutual's) claim. The premise of the common-law claim, however, is that a bank does have notice of potential foul play when the employee of a drawer attempts to negotiate a check payable to the order of the bank, and the drawer owes no debt to the bank. Paine, 255 Ill. App. at 261, 1929 WL 3406, at *5. The check itself poses an unanswered question as to whom the bank is to pay. Id.; Douglass v. Wones, supra, 458 N.E.2d at 522; People ex rel. Nelson v. Peoples Bank & Trust Co. of Rockford, supra, 271 Ill. App. at 46, 1933 WL 4479, at *2; see also Govoni & Sons Construction Co. v. Mechanics Bank, supra, 742 N.E.2d at 1104. The bank knowingly risks liability, then, when it honors the instructions of the presenter without verifying that his instructions reflect the wishes of the drawer. Courts in Illinois and elsewhere have therefore

rejected efforts to assert holder-in-due-course status as a defense to this type of claim. See Wones, 458 N.E.2d at 522-23; Milano v. Sheridan Trust & Sav. Bank, supra, 242 Ill. App. at 369-70, 1926 WL 3944, at *5; see also Govoni & Sons, 742 N.E.2d at 1104-05; Dalton & Marberry, P.C. v. NationsBank, N.A., supra, 982 S.W.2d at 235; Sun 'n Sand, 148 Cal. Rptr. at 342, 346-47.

The bank acknowledges that the cases are against it on this point but asserts they are out of date. A substantial re-write of Chapter Three took effect in 1992, and among the new provisions was section 3-307, on which the bank places such emphasis. The bank posits that Hemmen was a fiduciary, and therefore section 3-307, which spells out the level of notice required before a holder is subject to a claim for breach of fiduciary duty, controls the resolution of this case. But section 3-307 defines a "fiduciary" as "an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument." 810 Ill. Comp. Stat. 5/3-307 (emphasis ours). It is undisputed in this case that Hemmen had no authority to direct the proceeds of checks drawn on Jo Daviess' operating account and payable to the bank's order anywhere but into either the payroll account or the TT&L account. The only Jo Daviess account on which Hemmen was an authorized signer was the payroll account, and witnesses testifying on behalf of both parties agreed that Hemmen's authority vis a vis the payroll account did not give him authority to disburse funds from any other account. Hemmen on occasion did negotiate checks on the operating account to replenish the company's petty cash fund, but these checks were always in small amounts ($25 to $50, typically), and the checks were either payable to "cash" or a variant thereof or they contained notations indicating that their purpose was to replenish the petty cash drawer. In sum, as Judge Reinhard recognized, Hemmen may have been a fiduciary for some purposes, but he did not qualify as a fiduciary with respect to checks drawn on the operating account and made payable to the bank's order. See Empire Moving & Warehouse Corp. v. Hyde Park Bank & Trust Co., 357 N.E.2d 1196, 1202 (Ill. App. 1976) (discussed infra) (applying Illinois Fiduciary Obligations

Act); cf. Alton Banking & Trust Co. v. Alton Building & Loan Ass'n, 6 N.E.2d 921, 926 (Ill. App. 1937) (building and loan association's practice of permitting secretary to have charge of its books, receive cash, and deposit funds into its bank account did not establish implied authority to borrow money on association's credit).


F.

   The bank argues next that even if it was contractually obliged to see that the proceeds of checks payable to its own order were not misapplied, the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. 65/1, et seq. (the "FOA"), supplies it with a viable defense which, at a minimum, precluded the district court from granting judgment as a matter of law in favor of Mutual. As with its UCC defense, the bank's resort to the FOA rests on the premise that Hemmen was a fiduciary.

   "The purpose of the [FOA] is to facilitate banking and financial transactions and place on the principal the burden of employing honest fiduciaries." County of Macon v. Edgcomb, 654 N.E.2d 598, 601 (Ill. App. 1995), citing Johnson v. Citizens Nat'l Bank of Decatur, 334 N.E.2d 295, 300 (Ill. App. 1975). Section 1 of the FOA defines "fiduciary" to include a "partner, agent, officer of corporation, public or private, . . . or any other person acting in a fiduciary capacity for any person, trust or estate." 760 Ill. Comp. Stat. 65/1. The statute then goes on to provide, in relevant part:

A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary . . . .

760 Ill. Comp. Stat. 65/2. Broadly speaking, a person will be deemed to have acted in "good faith" for purposes of this provision even if his actions are negligent, so long as he acts honestly and is unaware that the fiduciary is breaching the duty he owes to his principal. See 760 Ill. Comp. Stat. 65/1(2); Edgcomb, 654 N.E.2d at 601;

Johnson, 334 N.E.2d at 299-300. In appropriate circumstances, then, the FOA will supersede the common-law rule and relieve the bank of the duty to see that the proceeds of a check are properly applied, even if the check at issue is one payable to the bank itself. St. Stephen's Evangelical Lutheran Church v. Seaway Nat'l Bank, 350 N.E.2d 128, 132 (Ill. App. 1976); Johnson, 334 N.E.2d at 298.

In St. Stephen's, for example, Ferguson, the treasurer of his church, wrote multiple checks on the church's account payable to the bank's order, the bank issued the proceeds to him, and Ferguson then used the funds for his own benefit. The church sued the bank for negligence and conversion and prevailed at trial. The appellate court reversed, however, concluding that because Ferguson qualified as a fiduciary who was authorized to receive and disburse church funds, the FOA absolved the bank of liability for releasing money to him. Naturally, as treasurer, Ferguson maintained the church's financial books and records, including its checking account. More importantly, the church had executed a bank resolution that not only authorized Ferguson to sign checks on the bank's behalf, but also authorized him, and only him, to supply the bank with directions as to disbursement of church funds. The resolution also expressly authorized the bank to honor checks drawn to Ferguson's order, without further inquiry concerning his authority or the designated use of the check proceeds. 350 N.E.2d at 129. This made application of the FOA straightforward:

Section 2 of the Act provides the bank with additional protection if Ferguson was authorized to receive the funds the bank paid him. The [church] argues that because the checks were payable to the bank and not to Ferguson or to cash, Ferguson was not entitled to receive their proceeds. However, Ferguson's authority to receive funds out of the church's account is supplied by the bank resolution which designates him as the only signator on the account and permits him to draw checks, drafts and orders to his individual order without need for further inquiry by the bank or question as to the use of the proceeds of such withdrawals. The broad power to withdraw

funds which the church granted to Ferguson as well as his right under the resolution to give the bank orders or directions . . . was the authority for Ferguson to receive the proceeds of checks he drew payable to the bank. When Ferguson presented the checks signed by him the logical response for the bank was to inquire of the depositor what disposition it wished made of them . . . . As the only person named by the church to make withdrawals from the account or give directions to the bank, Ferguson was the proper person for the bank to look to for instructions. Thus, the payment by the bank was to a fiduciary authorized to receive funds from the account, and Section 2 of the Act protects the bank against Ferguson's misapplication of the proceeds of the checks. . . .

350 N.E.2d at 130 (citation omitted).

The bank suggests that this case is no different than St. Stephen's. In its view, the undisputed facts establish that Hemmen was Jo Daviess' agent, thus rendering him a fiduciary for purposes of the FOA. The bank points out that Hemmen handled the bookkeeping for the company, made deposits, had signature authority over the payroll account, had authority to cash checks drawn on the operating account in amounts of up to $100 to replenish the petty cash fund, and, most importantly, had actual authority to tell the bank how to distribute the proceeds of checks made payable to the bank. Hemmen regularly exercised the latter authority when he presented checks, drawn on the operating account and payable to the bank's order, and directed that the proceeds be deposited into the TT&L account, for example.

However, it is the agent's specific authority to receive the proceeds of checks drawn to the bank's order which is crucial to the bank's ability to invoke the FOA. The very language of the statute highlights this point. Section 1 defines the term "fiduciary" as, inter alia, an "agent . . . or any other person acting in a fiduciary capacity for any person . . . ." 760 Ill. Comp. Stat. 65/1 (emphasis ours). The reference to the capacity in which the agent is acting suggests that his status as a fiduciary depends upon the particular activity in which he is engaged. See Master Chem. Corp. v.

Inkrott, supra, 563 N.E.2d at 30 (application of the Uniform Fiduciaries Act turns in part on "whether the fiduciary in fact possessed the authority to conduct the transaction in question"), citing Zions First Nat'l Bank v. Clark Clinic Corp., 762 P.2d 1090, 1101 (Utah 1988). Moreover, section 2 grants a person protection when he distributes to a fiduciary in good faith "any money or other property which the fiduciary as such is authorized to receive." 760 Ill. Comp. Stat. 65/2 (emphasis ours). This language reiterates the need to focus on the agent's authority with respect to the particular transaction at issue. In other words, as Judge Reinhard recognized, the fact that Hemmen may have been a fiduciary for some purposes did not render him a fiduciary for all purposes. Section 2 will not absolve the bank of liability for the presenter's misapplication of the check proceeds unless the evidence reveals that he was authorized to receive those proceeds. In St. Stephen's, the treasurer was so authorized. The same was true in Johnson, where an individual who was authorized to draft checks in his employer's name made a series of them payable to the bank's order and deposited the proceeds into his personal checking account. See 334 N.E.2d at 298. By contrast, in Empire Moving & Warehouse Corp. v. Hyde Park Bank & Trust Co., supra, the errant bookkeeper who took a series of checks issued to his employer, endorsed them over to a bank with a rubber stamp, obtained cash in exchange, and then absconded with the proceeds, was not an authorized signer on his employer's bank account. He did have the authority to make deposits into the account; moreover, company employees would often endorse their paychecks over to the company, and the bookkeeper's routine and accepted practice was to endorse them with the same rubber stamp that he eventually put to his own use, present them to the bank, and receive cash in return. In the court's view, however, the bookkeeper's authority in these respects was not sufficient to render him a fiduciary and therefore to relieve the bank of responsibility for cashing the checks that he had made payable to the bank:

The record shows that he was employed as a bookkeeper and that his authority extended only to depositing checks

payable to plaintiff in plaintiff's bank account. He had no authority to cash checks payable to plaintiff or to receive cash proceeds of such checks. . . . Any negotiation of checks payable to plaintiff would necessarily be governed by the corporate resolution lodged with [the bank]. To exonerate [the bank] here it would be obliged to prove that [the bookkeeper] came into possession of the proceeds of the checks as a fiduciary and that he had authority to endorse the checks. . . .

357 N.E.2d at 1202.

Here, no evidence demonstrates that Hemmen was ever given broad authority to receive cash on checks drawn to the bank's order, or to divert funds from the operating account to anywhere but the payroll or TT&L accounts, and it is Hemmen's lack of authority in this regard that precludes the bank's resort to Section 2. The fact that Hemmen could order funds moved from the operating account to one of the company's other accounts is of no moment; what is key is his authority to have funds from the operating account issued to himself. The simple fact is that Hemmen was never an authorized signer on the operating account. That he had signature authority on Jo Daviess' payroll account may have rendered him a fiduciary as to that account, but no other. The witnesses were in agreement on that point. The sole manifestation of Hemmen's authority toreceive money from the operating account was his occasional negotiation of checks made out to petty cash, which were invariably for $100 or less. We see nothing in the informal practice of cashing checks to replenish the petty cash fund that would have signaled to the bank that Hemmen had the equivalent of signature authority on the operating account. The checks at issue here were payable to the bank's order-- a fact which, as we have discussed, put the bank on notice of the need to inquire into the presenter's authority--and in contrast to the checks for petty cash, they contained no indication that their purpose was to replenish the petty cash fund. Also unlike the petty cash transactions (the largest of which involved a check for $87.02, see Pl. Ex. 19, Check No. 3498), these checks typically involved substantial sums of money. The first of

the checks at issue in this case, for example, was for the sum of $2,997. The entire amount of that check was disbursed to Hemmen in the form of two cashier's checks payable to his creditors. See Pl. Ex. 18, Jo Daviess Check No. 4379; Pl. Ex. 7, Jo Daviess Check No. 4379 & ESB Cashier's Check Nos. 5935, 5936; Pl. Ex. 55, Line 1. In short, whatever limited authority Hemmen may have enjoyed with respect to petty cash withdrawals did not give him authority to receive or disburse the proceeds of any and all checks payable to the bank's order. The bank thus took a risk in negotiating the checks for which it may now be held to account. As Judge Reinhard recognized, the fact that Hemmen may have been a fiduciary for some purposes did not render him a fiduciary for all purposes. Because he had no signature authority on the operating account, he cannot be treated as a fiduciary with respect to checks made payable to the bank's order.
G.

The bank contends next that the district court was wrong to preclude it from asserting the compensated surety defense. The basic thrust of that defense is that a compensated surety, and by analogy an insurer like Mutual, cannot sue a third party who would otherwise be liable on a claim brought directly by the insured unless the surety can show that its equities are superior to those of the third party. See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat'l Bank of Washington, D.C., 646 A.2d 966, 968 (D.C. 1994). For two reasons, the bank believes that Mutual cannot make such a showing. First, Mutual is in the business of insuring against losses of the kind occurred in this case; thus, when it compensated Jo Daviess for the loss, "[i]t did no more than it was obligated to do." National Cas. Co. v. Caswell & Co., 45 N.E.2d 698, 700 (Ill. App. 1942). Second, because Mutual has stepped into the shoes of its insured to bring suit, any negligence on Jo Daviess' part must be imputed to Mutual. As the bank sees things, its role in the loss was secondary to Hemmen's fraudulent acts and Jo Daviess' failure, as his employer, to detect those acts. See Continental Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc., 148 Cal. Rptr. 57, 64 (Cal. App. 1978). Judge Reinhard, noting that he could find no Illinois case

embracing the compensated surety defense, declined to allow this line of argument. May 26, 1999 Tr. at 6-7. We likewise find there to be no Illinois case on point, and, doing our best to predict how the Illinois Supreme Court is likely to rule, we conclude that Illinois would not recognize the defense.

The right of subrogation originated in equity. Dix Mut. Ins. Co. v. LaFramboise, 597 N.E.2d 622, 624 (Ill. 1992). It allowed a person who was compelled to pay someone else's claim or debt to succeed to that person's rights, so that the payor could recover from the individual whose conduct gave rise to the claim or debt. See id. In this way, courts sought to achieve substantial justice, "by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall." Id.; see also Schultz v. Gotlund, 561 N.E.2d 652, 653 (Ill. 1990); Riggs Nat'l Bank, 646 A.2d at 968. Subrogation can arise from an agreement (express or implied) between the subrogor and subrogee, in which case it is often referred to as conventional or contractual subrogation. Schultz, 561 N.E.2d at 653. But the right to subrogation does not invariably depend on the existence of an agreement; equitable subrogation can arise simply from the fact of payment. Riggs Nat'l Bank, 646 A.2d at 968; Federal Ins. Co. v. Arthur Andersen & Co., 552 N.E.2d 870, 872 (N.Y. 1990); Liberty Mut. Ins. Co. v. Thunderbird Bank, 555 P.2d 333, 335 (Ariz. 1976); see also Schultz, 561 N.E.2d at 653.

Equitable devices like subrogation are of course governed by equitable principles. One such principle is the doctrine of superior equities, which precludes a person from invoking the right of subrogation when the party against whom he seeks to exercise it has equities equal to or superior to his own. See, e.g., Riggs Nat'l Bank, 646 A.2d at 968. In that instance, "equity perceives no reason to vary the status quo." Id. The compensated surety defense, as we have noted, is a variant of this doctrine that typically allows one who is in the business of insuring others (i.e., who receives a premium for doing so) to invoke subrogation only when he can demonstrate equities superior to those of the person from whom he seeks to recover

for the insured loss. Id.; see Gregory R. Veal, Subrogation: The Duties and Obligations of the Insured and Rights of the Insurer Revisited, 28 Tort & Ins. L. J. 69, 86-87 (1992).

Not all states have embraced the compensated surety defense. Some jurisdictions have rejected it outright, and allowed insurers to subrogate whether or not they can demonstrate superior equities. E.g., Hartford Fire Ins. Co. v. Riefolo Constr. Co., 410 A.2d 658, 662 (N.J. 1980); South Carolina Nat'l Bank of Charleston v. Lake City State Bank, 164 S.E.2d 103, 106 (S.C. 1968); see also Federal Ins. Co., 552 N.E.2d at 876 (rejecting notion that defendant can escape liability simply because subrogee was paid to insure loss victim). Others have recognized the defense as valid even when the subrogation is conventional rather than equitable, declining to acknowledge any exception for contractually-based subrogation. E.g., Castleman Constr. Co. v. Pennington, 432 S.W.2d 669, 676 (Tenn. 1968); Meyers v. Bank of America Nat'l Trust & Sav. Ass'n, 77 P.2d 1084, 1085-86 (Cal. 1938) (per curiam). Still others assume the validity of the defense in cases of equitable subordination, but rule it out when the subrogation is conventional. E.g., Riggs Nat'l Bank, 646 A.2d at 971-72; Thunderbird Bank, 555 P.2d at 336-37. This line of authority reasons that when the subrogation is based on contractual provisions, it is not equitable in nature and consequently is not subject to equitable restraints. Riggs Nat'l Bank, 646 A.2d at 971-72; Thunderbird Bank, 555 P.2d at 336-37.

We can find no Illinois case that squarely addresses the validity of the compensated surety defense. There are hints in the cases suggesting that Illinois generally does follow the doctrine of superior equities. See, e.g., Makeel v. Hotchkiss, 60 N.E. 524, 527-28 (Ill. 1901) ("[Subrogation] will not be enforced when it would be inequitable to do so, or where it would work injustice to others having equal equities."). National Cas. Co. v. Caswell & Co., supra, on which the bank relies, cites the doctrine with approval in dicta, 45 N.E.2d at 700, but that case ultimately turned on the provisions of the Fiduciary Obligations Act, see id. at 701. Cases

such as Employers Ins. of Wausau v. Doonan, 664 F. Supp. 1220 (C.D. Ill. 1987), on which the bank also relies, further reveal that Illinois generally does not allow an insurer to subrogate against its own insured by suing the employees, officers, and directors of the insured, unless the equities support that result. See also Benge v. State Farm Mut. Auto. Ins. Co., 697 N.E.2d 914, 918 (Ill. App. 1998) (collecting cases). But no case that we can find speaks to whether, and when, the compensated surety defense will bar an insurer from suing a third party that caused its insured to suffer a loss.

Illinois is beginning to recognize a distinction between equitable and contractual subrogation, however. In recent years, the Illinois Appellate Court has consistently rejected the application of equitable principles to subrogation claims that arose from contract rather than equity. We just noted, for example, that Illinois courts follow the traditional rule in equity by precluding an insurer from subrogating against its own insured. In Benge, however, the court departed from that rule where the insurance policy contained a subrogation clause that expressly permitted the subrogation. "Where the right is created by an enforceable subrogation clause in a contract," the court explained, "the contract terms, rather than common law or equitable principles, control." 697 N.E.2d at 920. Similarly, in both In re Estate of Scott, 567 N.E.2d 605, 606-07 (Ill. App. 1991), and Capitol Indem. Corp. v. Strike Zone, 646 N.E.2d 310, 312 (Ill. App. 1995), the courts rejected application of the equitable principle that subrogation by an insurer should not be allowed if the insured has not been made whole by the insurer's payments to him. In both cases, the courts reasoned that when an enforceable subrogation clause permits an insurer to subrogate, the terms of the contract control over equitable principles.

These cases lead us to conclude that even if the Illinois Supreme Court were inclined to recognize the compensated surety defense in cases of equitable subrogation, it would not permit the defense in cases of contractual subrogation. See Help At Home, Inc. v.

Medical Capital, L.L.C., supra, 2001 WL 902462, at *3, quoting Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999) (where Illinois Supreme Court has not yet spoken to issue, decisions of Illinois Appellate Court control, absent persuasive reason to believe Supreme Court would decide the issue differently). Mutual's contract with Jo Daviess contained a subrogation clause that provided as follows:

Transfer of Your Rights of Recovery Against Others to Us: You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

Plaintiff's Ex. 1, Crime General Provisions para. 17. This provision unambiguously transferred to Mutual Jo Daviess' right to recover from the bank for the loss it sustained once the bank compensated Jo Daviess for that loss. Mutual's right of subrogation is thus founded in contract rather than equity, and it need not demonstrate that its equities are superior to the bank's in order to recover from the bank. Judge Reinhard correctly precluded the bank from asserting the compensated surety defense.

H.

The district court awarded Mutual $25,841.55 in prejudgment interest pursuant to section 2 of the Illinois Interest Act, 815 Ill. Comp. Stat. 205/2. R. 60. That section allows for prejudgment interest at the annual rate of five percent for, inter alia, "all moneys after they become due on any bond, bill, promissory note, or other instrument of writing[.]" Id. Mutual argued, and the district court agreed, that the deposit agreement between the bank and Jo Daviess qualified as an "instrument of writing" for purposes of the interest statute. Illinois courts define such an instrument as one which establishes a creditor-debtor relationship, e.g., Zayre Corp. v. S.M. & R. Co., 882 F.2d 1145, 1156 (7th Cir. 1989) (Illinois law); Servbest Foods v. Emessee Indus., Inc., 403 N.E.2d 1, 13 (Ill. App. 1980); Martin v. Orvis Bros. &

Co., 323 N.E.2d 73, 83 (Ill. App. 1974), and in the court's view, the deposit agreement satisfied that criterion. Damages must also be fixed and easily ascertainable in order for prejudgment interest to be awarded pursuant to section 2. E.g., Zayre Corp., 882 F.2d at 1156-57; Industrial Indem. Co. v. Vukmarkovic, 562 N.E.2d 1073, 1081 (Ill. App. 1990). In this case, the monetary relief that Mutual sought (and obtained) corresponded to the proceeds of the checks that the bank had improperly disbursed to Hemmen; consequently, the court had no doubt that the damages were indeed fixed and easily ascertainable. Accordingly, the court found that Mutual was entitled to prejudgment interest for the diverted proceeds of each check, beginning on the date the check was improperly negotiated by the bank. The bank argued that interest should run instead from the later date (April 17, 1996) on which Mutual actually paid Jo Daviess for the loss. But the court rejected this argument, reasoning that as a subrogee, Mutual stood in the shoes of its insured and was entitled to recover any amounts due and owing to Jo Daviess.

ESB suggests first that Mutual was entitled to no prejudgment interest at all, but we disagree. Illinois courts have deemed a variety of written instruments sufficient to support an award of interest pursuant to section 2, among them contracts. Fabe v. Facer Ins. Agency, 773 F.2d 142, 146 (7th Cir. 1985), cert. denied, 475 U.S. 1013, 106 S. Ct. 1192 (1986); In re Midway Airlines, Inc., 180 B.R. 851, 987 (Bankr. N.D. Ill. 1995). Moreover, Illinois courts often characterize the relationship between a bank and its depositor as that of creditor and debtor. Symanski v. First Nat'l Bank of Danville, 609 N.E.2d 989, 991 (Ill. App. 1993); Gluth Bros. Constr., Inc. v. Union Nat'l Bank, 518 N.E.2d 1345, 1349 (Ill. App. 1988); Menicocci v. Archer Nat'l Bank of Chicago, 385 N.E.2d 63, 66 (Ill. App. 1978). The deposit agreement between a bank and its customer therefore can serve as an "instrument of writing" for purposes of the statute. See Madison Park Bank v. Field, 381 N.E.2d 1030, 1034 (Ill. App. 1978). The court in Madison Park Bank, for example, found that the bank had breached the terms of the deposit agreement with its customer by

cashing a check for $9,000 without the two signatures that were called for by the contract. That breach, the court reasoned, placed the bank and its customer in a debtor-creditor relationship for purposes of the Interest Act. See id. ESB suggests that Madison Park Bank is distinguishable because in that case the check lacked the two signatures needed to render it valid, whereas here the checks that Hemmen presented were facially complete and the bank was thus obligated to honor them. What it was also obligated to do, however, given that the checks were drawn to the order of the bank, was not to release the proceeds of the checks to Hemmen without first verifying that his instructions comported with Jo Daviess' wishes. When it blindly followed Hemmen's instructions and issued cash or cashier's checks to Hemmen, the bank breached the contractual duty of care that it owed to Jo Daviess and, just as in Madison Park Bank, became indebted to Jo Daviess (and later to Mutual) for the proceeds of the checks. The bank's alternative suggestion, that the amount of damages was neither fixed nor easily ascertainable, fares no better. As Judge Reinhard pointed out, the damages corresponded directly to the check proceeds distributed to Hemmen--amounts that ESB's own records reflected. Although it may be true, as the bank suggests, that the legal basis of Mutual's claim has evolved over the course of the litigation, the damages themselves were always subject to quick calculation. See LaGrange Metal Prods. v. Pettibone Mulliken Corp., 436 N.E.2d 645, 652 (Ill. App. 1982) ("Prejudgment interest will be granted although a good faith defense exists and even where the claimed right and the amount due require legal ascertainment."); see also Ash v. Georgia-Pacific Corp., 957 F.2d 432, 439 (7th Cir. 1992) (Illinois law); DeKalb Bank v. Purdy, 520 N.E.2d 957, 967 (Ill. App. 1988).

A more meritorious argument is that Mutual was not entitled to interest for the period of time prior to the point at which it compensated Jo Daviess for the loss. It is certainly true, as Mutual argues and as Judge Reinhard observed, that Mutual as a subrogee stands in the shoes of its insured. See McCormick v. Zander Reum Co., 184 N.E.2d 882, 883

(Ill. 1962). Yet, the purpose of prejudgment interest is to fully compensate a party for money of which it has been wrongfully deprived. E.g., McKenzie Dredging Co. v. Deneen River Co., 619 N.E.2d 188, 191 (Ill. App. 1993). Before it made payment to its insured, Mutual had full use of its funds; only after it compensated Jo Daviess for the loss caused by the bank was Mutual in any sense deprived of its money. At the same time, so far as we can discern from the record, Mutual itself did not pay Jo Daviess any interest on its loss. Consequently, awarding prejudgment interest to Mutual for the period of time antedating its payment to Jo Daviess would amount to a windfall. Our research indicates that courts in these situations typically award the insurer interest commencing on the date the insurer made payment to its insured. See, e.g., Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A., 898 F.2d 1071, 1077 (5th Cir.) (Texas law), cert. denied, 498 U.S. 900, 111 S. Ct. 256 (1990); Webster v. M/V Moolchand, Sethia Liners, Ltd., 730 F.2d 1035, 1041 (5th Cir. 1984) (maritime law); St. Paul Fire & Marine Ins. Co. v. Fox Insulation Co., 1999 WL 782333, at *1 (W.D.N.Y. Sept. 30, 1999) (New York law); In re Scrima, 119 B.R. 539, 542 (Bankr. W.D. Mich. 1990) (Michigan law). We believe that this is the logical approach, and the one that the Illinois Supreme Court itself would take. Accordingly, we shall vacate the judgment and remand so that the award of prejudgment interest may be calculated appropriately.

III.

For the foregoing reasons, we AFFIRM the district court's decision to grant judgment as a matter of law in favor of Mutual on its contract claim against ESB. We VACATE the judgment and REMAND the case to the district court for the limited purpose of recalculating the award of prejudgment interest to commence on the date or dates that Mutual made payment to its insured. Mutual shall recover its costs of appeal. We commend Judge Reinhard for his able handling of this case.

FOOTNOTES

/1 Unless otherwise indicated, all citations to

"Tr." are to the Trial Transcript.

/2 Bank teller Kathy McCall testified that when Hemmen first presented one of these checks to her and asked for a cashier's check in return, she sought approval from Marvin Wurster, the bank's vice-president, because the request struck her as unusual. According to McCall, Wurster approved the request, and from that point forward she and the other tellers allowed Hemmen to negotiate checks payable to the bank in this way, although they believed it was "a little different." Tr. 195-98, 217-19. (McCall would later go to work for a different bank in Elizabeth. At that bank, she said, an individual who presented a corporate check payable to the bank could not receive cash back if he was not an authorized signer, unless the transaction was authorized by the company. Tr. 198.)

We note McCall's testimony but do not take it into consideration in assessing the propriety of the district court's decision to enter judgment as a matter of law in Mutual's favor. As noted above, we are obligated to construe the evidence in ESB's favor. Wurster himself could not recall having had such a conversation with McCall, and other bank personnel, who described McCall as a malcontent, doubted that the conversation had occurred.